IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
GREAT FALLS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>GEOFFREY PETER SCHARDIEN,<br><br>Defendant. | CR 10–87–GF–CCL-04<br>CV 14-29-GF-CCL<br><br><br>ORDER |

Before the Court is a Motion to Vacate, Set Aside, or Correct Conviction

and Sentence Pursuant to 28 U.S.C. § 2255 (Doc. 459) and brief in support (Doc.

460) filed by Defendant Geoffrey Peter Schardien ("Petitioner").

**Factual Background**

In 2011, Defendant Geoffrey Schardien and 8 other individuals were

indicted by a grand jury.  (Doc. 79.)  The Superseding Indictment charged them

with conspiracy to possess with intent to distribute 5 kilograms or more of cocaine (Count I), in violation of 21 U.S.C. §§ 841(a)(1) and 846. They were also charged with possession with intent to distribute (Count II) and distribution of over 5 kilograms of cocaine, both in violation of 21 U.S.C. § 841(a)(1). Defendant Schardien was convicted at the conclusion of a four-day jury trial of the Count I conspiracy, but the jury found that the conspiracy was to possess more than 500 grams but less than 5 kilograms of cocaine. (Doc. 287.) Defendant Schardien was also convicted of Counts II and III, but in each instance the jury specifically found that the possession and distribution involved less than 500 grams of cocaine. (Doc. 287.)

At sentencing on September 27, 2011, Defendant's Offense Level was 27, Criminal History was II, and Guideline Range was 70-87 months. (Doc. 378.) A maximum term of imprisonment of 40 years applied to Count I, but 20 years as to Counts II and III. The Court sentenced Defendant Schardien to a term of 80 months imprisonment, followed by a 48-month term of supervised release. (Doc. 379.) In 2012, Defendant's conviction and sentence were affirmed on appeal.

*United States v. Schardien*, 499 Fed.Appx. 717 (9th Cir. 2012), *cert. denied*, 133 S.Ct. 1741 (2013). On November 1, 2015, the Court reduced Defendant's sentence to a term of 65 months pursuant to Amendment 782, Appendix C, of the United States Sentencing Guidelines (2014).

At trial, the government presented the testimony of an undercover narcotics agent, who described the activities of two Utah residents, Co-Def.1 and Co-Def.2, who each brought cocaine to Great Falls, Montana, over a period of three years (2007-2010). Controlled drug buys occurred over a lengthy period of time, and deliveries of cocaine were made by Co-Def.1, Co-Def.2, and other individuals employed by them. To this day Co-Def.1 is still a fugitive, but Co-Def.2 testified regarding his participation in the conspiracy. Co-Def.2 described how he and Co-Def.1 initially made connections in Great Falls and some of the individuals to whom they sold cocaine. Co-Def.2 testified that he sold 18-20 ounces of cocaine to be split between Schardien and another individual. Co-Def.2 testified that he made many sales of cocaine to Schardien over a period of two years. Co-Def.2 testified that Co-Def.1 also sold cocaine to Schardien. A couple of times

Schardien bought in 8-ounce quantities. The most Schardien ever purchased was a 10-ounce quantity from Co-Def.1, a couple of times. Schardien purchased 4-ounce and 6-ounce quantities on numerous occasions. Co-Def.2 and Co-Def.1 would "front" the cocaine to their Great Falls purchasers and then wait a few days to be paid for the cocaine. Their customers, such as Schardien, would sell the cocaine and return payment to them. Co-Def.2 said his last sale to Schardien was in September 2009, but Co-Def.1 came to Great Falls alone in 2010 and might have sold cocaine to Schardien then.

Co-Def.2 did not know Schardien's name but only knew him by the nickname, "Gorilla." Co-Def.2 testified that he and Co-Def.1 stopped dealing with Schardien because Schardien owed them money.

An agent working for the Montana Division of Criminal Investigation testified that on May 4, 2010, he and other law enforcement officers were surveilling a residence (belonging to I.S.) in Great Falls because they believed that two individuals from Salt Lake City would be making a delivery of cocaine. They videotaped what they saw and did on that day. A vehicle, a Dodge Charger with

Utah plates, arrived at the residence of I.S., and after the presumed delivery was made the law enforcement agents followed. Law enforcement lost the vehicle when it turned down an alley behind Schardien's residence. Law enforcement did not follow the vehicle because they were only conducting surveillance, and they were not ready to arrest anyone. The video of the surveillance was played for the jury.

An inmate witness, A.G., testified that he met Schardien in January 2010. A.G. bought small quantities of cocaine from Schardien on 15 or 16 occasions, less than 2 ounces total. A.G. would sell some of the cocaine and turn the money over to Schardien. A.G. went to Schardien's residence to purchase cocaine, and he identified photographs of Schardien's residence as the place where he went to pick up cocaine. A.G. did a favor for Schardien on May 2010 that involved cocaine. Schardien was at a concert in Spokane, Washington. Schardien texted A.G. from cell number 217-1255, asking A.G. to go get cocaine from a cookie jar in Schardien's kitchen, and give it back to its owners, who would be arriving at Schardien's house shortly. A.G. did so. He did not know the individuals, but they were two Hispanic men in a gray vehicle with Utah license plates.

Another inmate, B.R., testified that he began purchasing cocaine from Co-Def.1 and Co-Def.2 in early 2007. He heard Co-Def.1 and Co-Def.2 talk about someone named Gorilla. B.R. recalled that one time he was a passenger in Co-Def.1's vehicle, and there was a meeting in a parking lot behind the Taco Treat restaurant in Great Falls. Co-Def.1 parked alongside Gorilla's white SUV. Co-Def.1 got out of his vehicle and got into Gorilla's vehicle. Five minutes later, Co-Def.1 got back into his own vehicle and Co-Def.1 and B.R. left the parking lot.

At one point, B.R. rented an apartment for Co-Def.1 and Co-Def.2 in Great Falls. In 2008, B.R. was visiting the apartment. Co-Def.2 left to go to the gas station nearby to get drinks and brought an individual back with him. Later, B.R. realized that the individual had been Gorilla, as will be explained further below.

On another occasion, B.R. was with Co-Def.1, who was on the phone. Co-Def.1 said that he was talking on the phone with Gorilla. Another time, B.R. complained to Co-Def.1 that the 4 ounces of cocaine he had just purchased had been tampered with. Co-Def.1 first called Gorilla, who said he hadn't tampered with it. Co-Def.1 then called Co-Def.2, who said he hadn't tampered with it. Co-Def.1 told B.R. it must have been Gorilla who cut the cocaine. B.R. testified that

in response to his complaint Co-Def.1 retrieved cocaine back from Gorilla.

B.R. did not know the identity of "Gorilla" until B.R. was housed in the same unit with him in the Crossroads Detention Center in Shelby. "Gorilla" approached B.R. to talk about the case, the discovery, and B.R.'s statement. B.R. identified Schardien at counsel table as the person he had known, both in Great Falls and in custody, who was nicknamed "Gorilla."

S.P. testified that he had known Co-Def.1 and Co-Def.2, and he had communicated with them by cell phone, voicemail, and texts a couple of times a month, starting in 2007. S.P. lives in Utah. He drove cocaine to Montana for Co-Def.1 six times, transporting one-quarter pound packages of cocaine. The Court granted defense counsel's objection and excluded S.P.'s proffered testimony that one time Co-Def.1 told him that they were delivering cocaine to Gorilla.

B.M. met Schardien through R.P. B.M. identified Schardien in the courtroom sitting at counsel table. B.M. purchased cocaine from his friend, R.P., who got it from Schardien. In November 2008, B.R. and R.P. met Schardien briefly in an alley on the northside, and R.P. paid Schardien for cocaine. B.M. also went to Schardien's house to pick up cocaine, and he identified photographs

of Schardien's house. B.M. and R.P. usually contacted Schardien by phone. They would buy one ounce quantities. On three occasions B.M. and R.P. went to Schardien's house at night and retrieved one ounce of cocaine from under Schardien's gas cover on his SUV. They left their money underneath Schardien's gas cover.

C.E., a Utah resident, testified that Co-Def.1 and Co-Def.2 paid him $1500 per trip to drive to Montana. The first delivery was marijuana, but after that it was all cocaine. C.E. never met an individual named Geoff but did hear the name Gorilla, and he overheard Co-Def.1 talk on the phone to Gorilla. On his last trip, C.E. drove Co-Def.1 to Gorilla's house to pick up something. C.E. was driving a Dodge Charger. He drove Co-Def.1 to the back of Gorilla's house, not the front. Co-Def.1 came out of Gorilla's house with a plastic grocery bag. Upon being shown the May 4, 2010, surveillance video, C.E. identified the vehicle in the video to be the Dodge Charger that he drove to Great Falls for Co-Def.1.

An FBI Agent testified that during a 60-day period of execution of a trap-and-trace order, Schardien had dozens of cell phone calls and texts with Co-Def.1

and Co-Def.2, including 92 text messages.

Petitioner defended the case by arguing that the government's witnesses could not be believed because they were testifying for benefits and that the drug weights were grossly overstated. The jury, in convicting, agreed with the Schardien to the extent that it found that his participation in the conspiracy was not to the level of 5 kilograms of cocaine foreseeable to him, but only to the level of 500 grams or more of cocaine. Otherwise, the jury convicted on all counts (conspiracy, possession with intent, and actual distribution of cocaine) but with lesser amounts of cocaine than had been charged. Petitioner now argues that the government presented false testimony to prove his connection to the drug conspiracy.

## Section 2255 Standard

A prisoner is entitled to relief under 28 U.S.C. § 2255 "[i]f the court finds that the judgment was rendered without jurisdiction, or that the sentence imposed was not authorized by law or otherwise open to collateral attack, or that there has been such a denial or infringement of the constitutional rights of the prisoner as to

render the judgment vulnerable to collateral attack. . . ." 28 U.S.C. § 2255. However, it is the prisoner's burden to establish his claims, and the prisoner must "clear a significantly higher hurdle than would exist on direct appeal." *United States v. Frady*, 456 U.S. 152, 166, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982).

This motion is subject to preliminary review to determine whether "the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255(b); *see also* Rule 4(b), Rules Governing Section 2255 Proceedings for the United States District Courts. When this standard is met, a hearing is not necessary. *Marrow v. United States*, 772 F.2d 525, 526 (9th Cir. 1985). Moreover, section 2255 relief provides an extraordinary remedy, *see United States v. Addonizio*, 442 U.S. 178, 184, 99 S.Ct. 2235, 60 L.Ed.2d 805 (1979), and it is the petitioner's duty to prove entitlement to it by a preponderance of the evidence, *see Farrow v. United States*, 580 F.2d 1339, 1355 (9th Cir. 1978).

A section 2255 motion is not appropriately used as a means "to relitigate questions which were or should have been raised on a direct appeal from the

judgment of conviction." *United States v. Marchese*, 341 F.2d 782, 789 (9th Cir. 1965). Claims already addressed on direct appeal are not cognizable by means of section 2255 motions unless cause and prejudice or actual innocence can be shown. *See United States v. Redd*, 759 F.2d 699, 701 (9th Cir. 1985).

Ineffective assistance of counsel claims arise under the Sixth Amendment and are governed by the two-prong test established in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). A habeas petitioner must show that counsel's performance was deficient. "This requires showing that counsel made errors so serious that counsel was not functioning as the counsel guaranteed by the Sixth Amendment." *Id.* at 687. Next, petitioner must show that the deficient performance prejudiced him so seriously as to "deprive [petitioner] of a fair trial . . . whose result is reliable." *Id*.

**Discussion**

<u>Ground One. Denial of Due Process of Law.</u>

Petitioner asserts that the government elicited false testimony from its witness, an FBI agent, who testified that government recordings of jailhouse

telephone calls by Schardien showed him to be involved in the conspiracy. According to Petitioner, this was a violation of his right to Due Process because the telephone recordings did not connect him to the conspiracy and both the prosecutor and the FBI agent therefore knowingly misled the jury by so stating.

A due process claim arises when the government presents false testimony to the jury. *See Mooney v. Holohan*, 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed.791 (1935) (per curiam); *Napue v. People of State of Illinois*, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959). In order to prevail on such a claim, Petitioner "must show that (1) the testimony (or evidence) was actually false, (2) the prosecution knew or should have known that the testimony was actually false, and (3) that the false testimony was material." *United States v. Zuno-Arce*, 339 F.3d 886, 889 (9th Cir. 2003) (citing *Napue*, 360 U.S. at 269-71, 79 S.Ct. 1173).

There are several problems with Petitioner's *Mooney-Napue* claim. The Court cannot agree with Petitioner's initial assumptions that the FBI agent's testimony was either false or material. Also, this due process claim appears to have been addressed and decided on direct appeal (although possibly abandoned

12

during the appeal process). To the extent that this due process claim has not already been appealed and decided in the government's favor, Petitioner fails to demonstrate cause and prejudice for this procedural default. Finally, Petitioner does not show that he is actually innocent, and the overwhelming evidence in the remainder of the government's case demonstrates that he is not.

First, Petitioner's recorded statements, as represented by Petitioner himself, do tend to show that he participated in the charged drug conspiracy. Petitioner states that the recordings reflect that he told his girlfriend on the jailhouse telephone that

> there's no way a jury's gonna find me guilty of being a f***** major player in a drug conspiracy, I mean, you know they'd been smarter to say, you know, I bought cocaine once for, you know, for a couple thousand bucks. How do I explain that away? That, that could very well be possibly something that occurred.

(Doc. 459-1, Pet. Supp. at 2.) Petitioner also informs the Court that in another separate jailhouse recording, he acknowledged that his cell phone number ended in 1225. (Doc. 459-1, Pet. Supp. at 3.) This was the same cell phone number that was proven to be in contact–dozens of times--with the charged conspiracy's out-

of-state drug suppliers during a 60-day trap-and-trace surveillance. The government's evidence did not show a casual purchase of a small user-quantity of cocaine. Schardien's admitted on the recording that he "might have" purchased a $2,000 quantity of cocaine. Schardien admitted on the recording that he had a certain cell phone number, that government surveillance showed was in constant contact with the two out-of-state drug suppliers. One of those drug suppliers testified that he fronted Schardien cocaine–frequently, over a lengthy period of time--so that Schardien could redistribute it and return payment to the suppliers.

All of this testimony and evidence more than adequately proved that Schardien was part of the conspiracy and not in a mere buyer-seller arrangement. *See United States v. Lapier*, 796 F.3d 1090 (9th Cir. 2015). The act of 'fronting' drugs implies that both buyer and seller understand that further illegal acts--the redistribution of the drugs by the buyer--must occur before profits can be realized. *Id.* Likewise, the frequency of sales and the length of the relationship demonstrates that this was more than a casual buyer-seller relationship. *See United States v. Ramirez*, 714 F.3d 1134, 1140 (9th Cir. 2013).

The jury did not hear these jailhouse recordings. Instead, they heard an FBI agent answer "yes" when he was asked by the prosecutor whether there was any actual telephone recording that connected Schardien to the conspiracy. (Doc. 423, TR 497:13-15.) Upon counsel's subsequent objection (not to this question, but to the next question), this Court ruled that the prosecutor was mistaken in believing that defense counsel had opened the door to this line of questioning, which was not permitted thereafter. The recorded telephone conversations were not played for the jury and were not mentioned again during the trial.

Petitioner is obviously unaware that a connection to a drug conspiracy need only be slight. In the recording, Petitioner's admitted involvement ("that could very well be possibly something that occurred") of purchasing two thousand dollars of cocaine does not rise to the level of a "major player," but it would clearly give him more than a slight connection to the drug conspiracy if it was purchased from the out-of-state drug suppliers with whom he was in frequent contact during the trap-and-trace surveillance. Thus, the Court does not accept Petitioner's initial premise that the prosecutor and FBI witness "told a bald-faced

lie to this Court and to the members of the Jury" when the witness stated that there

were recorded telephone calls that showed Geoffrey Schardien was involved in the

conspiracy. (Doc. 423, TR 497:13-15.) (Defense counsel's argument during trial,

outside the presence of the jury, that the recordings did not connect Schardien to

the conspiracy because the girlfriend was not a member of the conspiracy was

irrelevant to the connections the government was making with the recordings.) In

any event, the record shows that there were such recorded telephone calls and that

they did show that Schardien was connected to the conspiracy.

Even if that were not the case, Schardien fails to persuade this Court that the

allegedly false testimony was material. Petitioner complains of one question-and-

response that informed the jury that he was involved in the conspiracy. This

alleged falsehood would be material if there were "any reasonable likelihood that

the false testimony could have affected the judgment of the jury." *United States v.

Agurs*, 427 U.s. 97, 103, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). "'The question is

not whether the defendant would more likely than not have received a different

verdict with the evidence, but whether in its absence he received a fair trial,

understood as a trial resulting in a verdict worthy of confidence.'" *Hall v. Director of Corrections*, 343 F.3d 976, 983-84 (9th Cir. 2003) (per curiam) (quoting *Kyles v. Whitley*, 514 U.S. 419, 434, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995)).

In the full context of all the evidence presented against Schardien at trial, it is unlikely that the jury would even have paid attention to such a minor bit of testimony. Compare this single question-and-answer testimony to (1) the testimony of the out-of-state drug supplier asserting that he "fronted" Schardien cocaine in retail quantities once or twice a month from late 2007 to late 2009 (Doc. 421, TR 130:17-131:1), (2) the testimony of another witness who told the jury that he sold the cocaine fronted to *him* by Schardien, (3) the testimony of a third witness who saw the drug suppliers with Schardien and heard one of them blame Schardien for tampering with, or cutting cocaine, (4) the testimony of a fourth witness who (with a friend) purchased cocaine from Schardien on multiple occasions, (5) the testimony of a fifth witness who drove one of the aforementioned drug suppliers to Schardien's house to retrieve something in a plastic bag, and (6) the surveillance video and related testimony and the trap-and-

trace surveillance evidence and related testimony. All the evidence connected Schardien to the drug conspiracy. The Court concludes that Schardien received a fair trial "resulting in a verdict worthy of confidence." *Kyles v. Whitley*, 514 U.S. at 434.

Second, the issue of the jailhouse recordings is a ground for relief that has already been covered in Petitioner's direct appeal. The prosecutor believed that defense counsel had opened the door to permit the government to inquire of its witness regarding Schardien's jailhouse telephone conversations with his girlfriend. The prosecutor asked whether the recorded conversation indicated that Schardien was involved with the conspiracy. (Doc. 423, TR 497:13-15.) Then the prosecutor asked whether the recorded conversation indicated that Schardien spoke of manipulating the jury. (Doc. 423, TR 498:2-3.) After hearing the latter question, defense counsel objected by stating, "Objection, your honor, 403, 404, and that is a complete misrepresentation as to being involved in this conspiracy, your honor." (Doc. 423, TR 498:4-6.) The jury was retired and defense counsel moved for a mistrial, stating as follows:

Your Honor, I move for a mistrial at this time, based on the question
asked by the United States regarding an in-jail telephone call between
my client and his girlfriend. And the representation that that phone
call somehow implicates or implies my client in this conspiracy in
any way, Your Honor. And furthermore, Your Honor, and if the court
wants to listen to the phone call, I also move for a mistrial at this
time, regarding the representation made by the United States in front
of the jury that my client was manipulating the jury. If the court
wants to hear the phone call, I invite the court to listen to the phone
call. But I believe under the circumstances and the manner in whic h
that question was asked and the inference that was given to the jury,
that is not an accurate representation of that phone call. It's
extremely prejudicial, 403, Your Honor. And I would move for a
mistrial at this time."

(Doc. 423, TR 498:18-499:9.) The Court denied defense counsel's motion for a

mistrial, brought the jury back into the courtroom and immediately instructed as

follows:

Immediately prior to your being sent out for the last recess, there had
been a question asked by Mr. Carroll. There was an objection made
to that question. The court now instructs you to disregard and forget
the question and the objection. Both should be disregarded in
reaching your verdict in the case.

(Doc. 423, TR 505:8-13.) With that, there was no further mention of the jailhouse

recordings during the trial.

On direct appeal, defense counsel briefed and argued the Court's failure to grant the motion for mistrial. The appellate court decided that the court's limiting instruction was adequate and "[t]he trial court did not abuse its discretion in refusing to grant a mistrial." *United States v. Schardien*, 499 Fed.Appx. 717 (9th Cir. 2012), *cert. denied*, 133 S.Ct. 1741 (2013). This 2255 motion cannot be used to relitigate issues already resolved on direct appeal. *See United States v. Marchese*, 341 F.2d 782, 789 (9th Cir. 1965). The Ninth Circuit panel found that the witness testimony regarding the jailhouse recordings was adequately handled by the limiting instruction and that the district court did not abuse its discretion in denying the motion for mistrial. Thus, Petitioner received a hearing on his objection to the FBI agent's testimony at both the district court level and at the appellate level. At the district court level, Petitioner's objection was heard and sustained, and Petitioner received a limiting instruction telling the jury to forget the question and answer, so that the objectionable witness testimony was ignored thereafter. At the appellate level, Petitioner was permitted to brief and argue his objection to the witness testimony and the district court's failure to grant a

mistrial.

When a due process error occurs at trial, it is because the error "[had] the effect of converting what was otherwise a fair trial into one which is repugnant to an enlightened system of justice." *Vandergrift v. United States*, 313 F.2d 93, 94 (9th Cir. 19363). Because defense counsel's objection was both heard and sustained by the district court and heard and rejected by the appellate court, Schardien fails to establish that he was deprived of a fair trial by a failure of due process.

Furthermore, to the extent that defense counsel noted but failed on direct appeal to argue this particular ground supporting his mistrial motion, that ground was abandoned. Issues raised in a brief but not argued are deemed abandoned. *Martinez-Serrano v. I.N.S.*, 94 F.3d 1256, 1259 (9th Cir. 1996) (citing *Acosta-Huerta v. Estelle*, 7 F.3d 139, 144 (9th Cir. 1992). Therefore, to the extent that Petitioner did not receive a full hearing on this issue on direct appeal, it is only because he abandoned a potential claim.

Third, even if a defense counsel fails to raise a valid claim on direct appeal,

Petitioner must demonstrate either cause and actual prejudice for this failure to raise this issue on direct appeal or that he is innocent of the offense. *Bousley v. United States*, 523 U.S. 614, 622 (1998) (internal citations omitted). Cause for such a procedural default must be some factor external to the defense. *See Murray v. Carrier*, 477 U.S. 478, 488, 106 S.Ct. 2639 (1986). Petitioner demonstrates no reason that this claim could not have been raised on direct appeal. Neither has Petitioner demonstrated prejudice, which would require Petitioner to demonstrate more than the mere possibility of prejudice, but that the error "worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *United States v. Frady*, 456 U.S. 152, 167-68, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982).

Similarly, by minimizing and ignoring the government's evidence against him, Petitioner fails to persuade that he is actually innocent of the offense. Thus, Schardien's due process claim fails on its merits. Essentially, the weak violation claimed is made irrelevant by the overwhelming evidence contained in the rest of the government's case.

<u>Ground Two.  Ineffective Assistance of Counsel.</u>

Schardien takes the position that his defense counsel rendered ineffective assistance when counsel failed to assert the alleged due process violation on appeal.  Petitioner is referring to the same claim stated by Ground One.

As explained above, the Court believes that as a matter of fact the recorded telephone calls did tend to show that Schardien was involved in the charged conspiracy.  There was therefore no false testimony but a difference of opinion.  Nevertheless, upon defense counsel's objection, the Court did rule that defense counsel's cross-examination had not opened the door to permit this line of questioning, and the Court so informed the prosecutor, who was thereafter not permitted to mention the telephone recordings.

Petitioner must satisfy the two-prong *Strickland* standard by showing that his counsel's performance was deficient and that it prejudiced him so seriously as to have deprived him of a fair trial resulting in a reliable outcome.  It appears that defense counsel was aware of this argument and at least alluded to it in his appellate brief.  Instead of asserting this claim in argument, however, defense

counsel chose to emphasize a companion claim, which was that the prosecutor

unfairly prejudiced Schardien by introducing testimony that Schardien spoke of

"manipulating the jury during those phone calls."[1]  (Doc. 423, TR 498:2-3.)  That

was one of two issues that defense counsel appealed to the Ninth Circuit.[2]

---

[1]    The trial transcript shows this question and answer:
"         And did Mr. Schardien speak of manipulating the jury on any of
those phone calls?
         MR. HOLDEN:  Objection, Your Honor, 403, 404, and that is a
complete misrepresentation as to being involved in this conspiracy, Your
Honor."  (Doc. 423, TR 498:2-6).

Petitioner represents his actual recorded conversation to be as follows:
[Schardien]: "... looking into the eyes of my children in the back of the
courtroom."
[Female]: "Well, it doesn't even have to do with the kids, I mean, it just has
to do with the facts, you know."
[Schardien]: "I know, but that's, but listen, human beings are like the most
manipulat–, they're the most easy to manipulate being on the, on the planet.  And
they're unpredictable.  You can make one think one way one day and one another.
And that's all it comes down to.  It's a game of manipulation.  My lawyer's gotta
f****' make a jury believe more than the f***' prosecutor can."  (Doc. 459-1, Pet.
Supp. at 2.)

[2]    The other issue raised on direct appeal was whether the district court
abused its discretion in denying Schardien the right to cross-examine Co-Def.2
about the fact that Co-Def.2 received a mandatory minimum sentence.  That issue
was also decided against Petitioner.

Defense counsel decides what issues are worth pursuing on appeal, and defense counsel is under no obligation to raise every conceivable claim. *See Jones v. Barnes*, 463 U.S. 745, 751-52 , 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983). "This process of 'winnowing out weaker arguments on appeal and focusing on' those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy." *Smith v. Murray*, 477 U.S. 527, 536, 106 S.Ct. 2661, 91 L.Ed.2d 434 (1985) (quoting *Jones v. Barnes*, 463 U.S. 745, 751-52, 103 S.Ct. 3308, 3312-3313, 77 L.Ed.2d 987 (1983)). This issue was apparently deemphasized by defense counsel because he thought it was weaker than the jury-manipulation issue.

"Generally, only when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of counsel be overcome." *Smith v. Robbins*, 528 U.S. 259, 288, 120 S.Ct. 746, 145 L.Ed.2d 756 (2000) (quoting *Gray v. Greer*, 800 F.2d 644, 646 (7th Cir. 1986). Under all the circumstances presented by this section 2255 motion, it is clear that the argument foregone was not merely weak but ultimately defective and unlikely to be

successful. The Court concludes that defense counsel chose the stronger argument to raise on direct appeal and that it was an appellate strategy that appeared reasonably promising. Petitioner has therefore failed to show that counsel's performance was defective or that any prejudice accrued to Petitioner therefrom.

**Conclusion**

Thus, having considered the Petitioner's Motion, the Court's file, and all the record of this case, the Court has determined that the Petitioner is not entitled to relief as to his section 2255 Motion to Vacate Sentence. Accordingly,

IT IS HEREBY ORDERED that Petitioner's Motion Pursuant to 28 U.S.C. § 2255 (Doc. 459) is DENIED.

A district court must issue a certificate of appealability when jurists of reason would find it debatable whether the motion states a valid claim of the denial of a constitutional right. *Slack v. McDaniel*, 529 U.S. 473, 120 S.Ct. 1595, 1603, 146 L.Ed.2d 542 (2000). Finding that Petitioner Schardien has failed to make a substantial showing of the denial of a constitutional right and that no jurist of reason would debate the correctness of denying Petitioner collateral relief,

IT IS FURTHER ORDERED that a certificate of appealability is DENIED.

The Clerk is directed forthwith to notify Petitioner Schardien of the entry of this order.

Done and Dated this 6th day of January, 2016.

CHARLES C. LOVELL
SENIOR UNITED STATES DISTRICT JUDGE